**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**George WUAGNEUX,**
**Defendant-Appellant.**

**No. 80–5763.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 23, 1982.

Briggs & LaSpada, Anthony J. LaSpada, Tampa, Fla., Sands & Moskowitz, Leonard A. Sands, Jay Moskowitz, Miami, Fla., for defendant-appellant.

William C. Bryson, Robert J. Erickson, Washington, D. C., for plaintiff-appellee.

Before INGRAHAM *, HATCHETT and ANDERSON, Circuit Judges.

INGRAHAM, Circuit Judge:

George Wuagneux was convicted, after a jury trial in the Southern District of Florida, of operating a business through a pattern of racketeering activity, 18 U.S.C. § 1962(c) (1976) (RICO), embezzlement of funds from an employee welfare benefit plan, 18 U.S.C. § 664 (1976), mail fraud, 18 U.S.C. § 1343 (1976), bank fraud, 18 U.S.C. § 1014 (1976), and filing false income tax returns. 26 U.S.C. § 7206(1) (1976). The indictment contained thirteen counts: two counts and two subsections of the RICO

---

* Honorable Joe Ingraham, U. S. Circuit Judge for the Fifth Circuit, sitting by designation.

count were dismissed by the court; guilty verdicts were returned on all eleven remaining counts. Appellant raises the following issues on appeal: whether the district court erred in denying his motion to suppress evidence seized in a search of his offices; whether venue was improper as to Count 9, bank fraud; whether hearsay evidence was improperly admitted; and whether the evidence was sufficient as to each count. We affirm.

Because of the variety of issues raised, we will provide only a brief background at the outset and add facts as relevant to the discussion of a particular issue. Appellant was the chief executive officer and controlling shareholder of Sage Corporation, a general construction company headquartered in Hallandale, Florida. During the early and mid-1970's, Sage and its subsidiaries were engaged in the construction of a number of condominium and office building projects in South Florida. Sage's former office administrator testified that before the corporation encountered financial difficulty during the years 1974–75, the corporation had employed several hundred persons exclusive of subcontractors and construction personnel.

Sage Corporation attracted the attention of a Department of Justice Organized Crime Strike Force in the course of its investigations in South Florida. In particular, the investigation of two individuals, Bernard Rubin and Seymour Gopman, revealed connections between these individuals and Sage Corporation that led the Justice Department to believe appellant had engaged in a series of fraudulent and illegal schemes to obtain financial assistance for Sage. The government eventually charged appellant with defrauding two union pension funds, an annuity fund, a real estate investment trust, the Florida Department of Insurance, and a commercial bank; in addition, the government charged that appellant had failed to adequately report various sources of income, both legitimate and illegitimate.

## I—MOTION TO SUPPRESS

Appellant contends that the district court erred in denying his motion to suppress evidence obtained through a search of his offices pursuant to a warrant. He asserts five specific grounds of error: consent to a civil IRS audit, which later provided some support for the search warrant, was ineffective because the Revenue Agent conducting the audit did not disclose his affiliation with an IRS Strike Force; the warrant did not contain a sufficiently particular description of items to be seized; the execution of the warrant was overbroad; the district court improperly limited review of the execution of the warrant to those items the government intended to use at trial; and the trial court failed to conduct an adequate hearing into allegations that the affidavit supporting the search warrant contained false statements made with reckless disregard for the truth.

### A. Consent to Audit by IRS Revenue Agent [1]

On December 15, 1976, Revenue Agent Chapman went to the offices of Sage Corporation under instructions to conduct a civil audit of its books and records. Chapman met with Sage's comptroller, Jack Shields, and accountant, Joseph Spina. He identified himself as an IRS Revenue Agent, displayed his credentials, and told Shields and Spina that he was there to conduct a tax audit. He did not further reveal that he was assigned to an IRS "strike force group." Shields and Spina, with the consent of appellant, agreed to cooperate with the audit. Chapman was given an office on the premises, and conducted an examination until March 9, 1977, when appellant became upset because

---

1. Revenue Agents are civil auditors. Criminal investigators at the time of the events in ques-tion were titled Special Agents.

Chapman had taken Sage records back to IRS headquarters. Although Chapman made several unsuccessful attempts to resume the audit, his supervisor eventually recommended no further enforcement action (on the basis of the information already gathered).

The IRS "strike force" group was organized within the audit division to handle complex and specialized examinations, and was wholly independent of the Department of Justice Organized Crime Strike Force. In fact, IRS subsequently changed the name of the group to "Special Enforcement Group." Although the IRS strike force frequently conducted tax examinations of suspected organized crime figures, a relatively small percentage of the group's cases were referred to the Department of Justice Strike Force, or resulted in any criminal proceedings.

The reason the Sage audit was initiated was never definitively determined in the proceedings below. Allen Pasternak, the head of the strike force audit group, testified that the audit was probably instigated for one of three reasons: substantial newspaper coverage of Sage Corporation (of an unspecified nature); ongoing tax collection problems with Sage; or ongoing strike force investigation of various transactions involving Teamster loans, an area Sage was also involved in. Notwithstanding this confusion, the overwhelming weight of credible testimony supports the district court's findings that the audit was not initiated at the request or suggestion of the Department of Justice,[2] and that it was an examination for civil purposes from its inception through March 1977.

Apparently, the tax fraud counts in appellant's indictment were not a product of Chapman's audit. For purposes of the mo-

tion to suppress, however, appellant argues the audit was relevant because it enabled Chapman to provide the Department of Justice with sufficient information about Sage's records to establish probable cause for a search. Appellant argues that the consent to audit given by appellant and his representatives was ineffective, citing *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977), because of Chapman's failure to advise of his affiliation with the IRS strike force. Shield and Spina testified that had this further information been disclosed, they would have insisted that the IRS proceed by summons, and advised appellant to seek legal counsel.

 While "a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue Agent," *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977) (citing cases), the circumstances of this case do not indicate any deceit, trickery or misrepresentation. A party alleging ineffective consent on this ground must show affirmative acts by the agent that materially misrepresent the nature of the inquiry, and the showing must be by clear and convincing evidence. *United States v. Dawson*, 486 F.2d 1326, 1329 (5th Cir. 1973); *United States v. Prudden*, 424 F.2d 1021, 1032–33 (5th Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970). *See also United States v. Goss*, 650 F.2d 1336, 1348–49 (5th Cir. 1981). Appellant concedes that no affirmative misrepresentation was made in this case, but insists that Chapman's silence with respect to his group affiliation was improper. *Prudden* suggests that silence could vitiate consent "where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally mis-

---

2. Appellant suggests a contrary conclusion from evidence that a Department of Justice Strike Force member asked Chapman to verify how two checks had been treated on Sage's books. Despite this request, the evidence is clear that Chapman's audit was not initiated by the Justice Department, and that Chapman was

not turning over documents from his audit to the Justice Department. *See also United States v. Chemical Bank*, 593 F.2d 451, 454–57 (2d Cir. 1979) (participation of individual IRS agents in Justice Department Strike Force does not convert IRS into information gathering agency for Justice Department).

leading." 424 F.2d at 1032. There was no "inquiry left unanswered" here, nor an inquiry answered deceitfully. *Cf. Tweel, supra.* There was also no duty to speak. Although Special Agents have been instructed, ostensibly because of Fourth, Fifth and Sixth Amendment concerns, to provide *Miranda*-like warnings in certain confrontations with taxpayers, *see United States v. Dawson*, 486 F.2d 1326, 1329 n.3 (5th Cir. 1973), apparently no analogous requirements have been applied to Revenue Agents. Chapman's disclosure that he was from the IRS and intended to conduct a tax audit was adequate for Fourth Amendment purposes:

> The Fourth Amendment does not require more than this, that when his consent is sought the taxpayer be apprised of the government's concern with the accuracy of his reports, and therefore of such hazards as may be incident to a voluntary disclosure. We hold that [the taxpayer] was so apprised by the warning inherent in the request when [the Revenue Agent] identified himself and disclosed his purpose to audit certain returns of the corporation.

*United States v. Sclafani*, 265 F.2d 408, 415 (2d Cir.), *cert. denied*, 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959); *see also Prudden, supra*, 424 F.2d at 1032 (identity fully disclosed); *United States v. Bailey*, 447 F.2d 735, 738 (5th Cir. 1971). It is established, at the least, that revenue agents need not expressly advise taxpayers that a routine civil audit may lead to criminal proceedings if discrepancies are uncovered, as all taxpayers, especially businessmen, are presumed to be aware of this possibility. *United States v. Ponder*, 444 F.2d 816, 819–20

(5th Cir. 1971), *cert. denied*, 405 U.S. 918, 92 S.Ct. 944, 30 L.Ed.2d 788 (1972); *Prudden, supra*, 424 F.2d at 1035. With that in mind, we fail to see how the additional disclosure or nondisclosure of group affiliation within the civil audit bureaucracy of the IRS could materially affect the voluntariness of a taxpayer's consent to an audit, *cf. United States v. Bland*, 458 F.2d 1, 8 (5th Cir.), *cert. denied*, 409 U.S. 843, 93 S.Ct. 43, 34 L.Ed.2d 83 (1972), and we decline to impose such a requirement as a constitutional matter in this case.[3]

**B. Particularity of Search Warrant**

The Fourth Amendment requires that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S.Const. amend. IV. This requirement is aimed at preventing "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971); *see generally Stanford v. Texas*, 379 U.S. 476, 481–85, 85 S.Ct. 506, 509–511, 13 L.Ed.2d 431 (1965) (requirement of particular description derives from Colonial resistance to general warrants and writs of assistance); *United States v. Osborne*, 630 F.2d 374, 378 (5th Cir. 1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981). A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized. *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981), *citing Steele v. United States*, 267 U.S. 498, 503–04, 45 S.Ct. 414, 416–417, 69 L.Ed. 757 (1925). Failure to adequately enforce the particularity requirement would undermine the warrant requirement itself,

---

**3.** In view of our holding that the consent was effective, we do not reach the question whether Chapman's contribution to the application for a search warrant thereby tainted the warrant. However, we note in passing that Chapman's contribution was apparently quite limited. Justice Department Strike Force attorney Steinberg testified the affidavit for the warrant was prepared from other sources, principally in the Gopman investigation, and had been substan-

tially completed before Chapman was interviewed. At that point Chapman was able to describe the layout of Sage's offices and verify that certain types of records were maintained and could be located by the search party. While this contribution enabled the Justice Department to narrow the terms of the search warrant, it evidently had no effect on the number or type of transactions targeted for investigation by the Strike Force.

and increase the risk of an excessive intrusion into the areas of personal rights protected by the Fourth Amendment. *Cf. Cook, supra,* 657 F.2d at 733 ("weigh the practical necessities of law enforcement against the likelihood of a violation of the personal rights of the one whose premises and possessions are to be searched").

■ At the same time, the Supreme Court has recognized that effective investigation of complex white-collar crimes may require the assembly of a "paper puzzle" from a large number of seemingly innocuous pieces of individual evidence: "The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession." *Andresen v. Maryland,* 427 U.S. 463, 481 n.10, 96 S.Ct. 2737, 2749 n.10, 49 L.Ed.2d 627 (1976). *See also United States v. Jacob,* 657 F.2d 49, 52 (4th Cir. 1981) (consider complexity of alleged fraud), *cert. denied,* —— U.S. ——, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *United States v. Abrams,* 615 F.2d 541, 548 (1st Cir. 1980) (Campbell, J., concurring) (investigators in fraud cases do not and often cannot know in advance what precisely they will find in files). It is universally recognized that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit. *See United States v. Lowry,* 675 F.2d 593, 595 (4th Cir. 1982); *United States v.*

*Timpani,* 665 F.2d 1, 5 (1st Cir. 1981); *United States v. Morisse,* 660 F.2d 132, 136 (5th Cir. 1981); *United States v. Bright,* 630 F.2d 804, 812 (5th Cir. 1980); *United States v. Dennis,* 625 F.2d 782, 792 (8th Cir. 1980); *United States v. Burns,* 624 F.2d 95, 101 (10th Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980); *United States v. Davis,* 589 F.2d 904, 906 (5th Cir.), *cert. denied,* 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979). Accordingly, in cases such as the one before us involving complex financial transactions and widespread allegations of various types of fraud, reading the warrant with practical flexibility entails an awareness of the difficulty of piecing together the "paper puzzle." *See also United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965) ("A grudging or negative attitude by reviewing courts towards warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.").[4]

The affidavit in support of the warrant before us was sworn by Vincent O'Dea, a Special Agent with the IRS assigned to the Justice Department Organized Crime Strike Force. In his affidavit, O'Dea describes how he and other investigators tracing the activities of Gopman and others had uncovered repeated mention of Sage Corporation. As a result the government suspected, among other things, that Sage was being used as an intermediary to funnel kickback funds to Gopman and others, and that an inspection of Sage's records would reveal how such transactions were accomplished. The warrant accordingly calls for the seizure of eleven categories of records from

---

4. Appellant places considerable emphasis on the statement in *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), that "as to what is to be taken, nothing is left to the discretion of the officer executing the warrant." 275 U.S. at 196, 48 S.Ct. at 76. As this court and others have observed, however, if this statement were construed as a literal command, no search would be possible. *Gurleski*

*v. United States,* 405 F.2d 253, 257 (5th Cir. 1968), *cert. denied,* 395 U.S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769 (1969); *see also United States v. Abrams,* 615 F.2d 541, 550–51 (1st Cir. 1980) (Campbell, J. concurring), *citing* 2 W. LaFave, Search & Seizure § 4.6 at 96 (1978). Instead, our concern is whether the warrant provides sufficient guidelines and limitations to meet the test of particularity already described above.

the premises of Sage Corporation.[5] Appellant criticizes nearly every category, contending that the descriptions give insufficient guidance on how to distinguish the records authorized to be seized and therefore that the warrant leaves an unacceptable amount of discretion to the searching officers.

■ At the outset, we find categories 2 through 11 unobjectionable under the principles just reviewed. These categories call for seizure of records relating to specific companies, persons and financial transactions, as those records relate to specific crimes. The type of record is described wherever possible, for example, "loan records," "correspondence" and "agreements." Appellant does not contend that seizure of documents fitting these descriptions would not be supported by the probable cause established by Agent O'Dea's affidavit. We conclude that categories 2 through 11 are drawn as narrowly as could be expected, given the state of the Justice Department's knowledge as to what they might find and the nature and extent of criminal activities under investigation, and that the descriptions were sufficient to enable the agents to reasonably ascertain and identify the records to be seized. *Cf. United States v. Timpani*, 665 F.2d 1, 5 (1st Cir. 1981); *United States v. Morisse*, 660 F.2d 132, 136 (5th Cir. 1981); *James v. United States*, 416 F.2d 467, 473 (5th Cir. 1969), *cert. denied*, 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970).

■ The only potentially troubling category is No. 1, records of "the receipt and disbursement of kickback funds." Appellant argues that this phrase would have no specific meaning unless a file marked "kickback funds" was encountered. We do not share appellant's concern that the phrase "kickback funds", by itself, is vague or undefinable. The term "kickback funds" has a generally understood meaning and a searching officer could be expected to readily recognize a document as fitting this description. *See, e.g., United States v. Long*, 534 F.2d 1097, 1100 (3d Cir. 1976). The phrase is ambiguous, however, inasmuch as further facts are required to enable an officer to identify records of payments the Strike Force had probable cause to believe were improper kickbacks. This ambiguity is resolved by Agent O'Dea's af-

5. The warrant authorized seizure of records of the following:

(1) the receipt and disbursement of kickback funds;

(2) the interest in Sage Corporation by Seymour Gopman, Bernard Rubin, and other labor union officials or nominees for these persons;

(3) records of payment to Gopman, Rubin, or other labor union leaders in cash, check, bond, property, etc.;

(4) loan records reflecting the $500,000 teamster trust fund loan and its subsequent disbursement;

(5) loan records reflecting the $400,000 District Council Trust Fund loan and its subsequent disbursement;

(6) records of correspondence, agreements, loans, or other financial arrangements between Gopman, Rubin, Fortune Services, union officials or other persons or entities acting in their behalf and Sage Corporation;

(7) records of Sage's subsidiaries and any interest in them by Gopman, Rubin, or any other labor official or nominees or entities acting on their behalf;

(8) records of any financial transactions between Sage Corporation and its subsidiaries and Gopman, Rubin, or other union officials or their nominees or entities acting in their behalf;

(9) the receipt by Sage Corporation and disbursement of funds from Ace Services, Fortune Services, Seymour Gopman or his law firm;

(10) records of any financial transactions between labor union trust funds and Sage Corporation or its subsidiaries, which are evidence of violations of 26 U.S.C. 7201, 7203 and 7206(1), 18 U.S.C. 664, 18 U.S.C. 1954, 1962, and 29 U.S.C. 501; and

(11) property that constitutes evidence of the above-enumerated offenses, fruits of the crimes named-above and property which is or has been used to commit the crimes enumerated herein.

fidavit.[6] The affidavit states that the Strike Force investigation of Seymour Gopman led agents to believe that Gopman had received approximately $700,000 over a three-year period, representing kickbacks for arranging a contract between the South Florida Laborers' Union District Council, and Consultants & Administrators, Inc. of Chicago and its subsidiaries. This kickback scheme allegedly funneled money through Sage Corporation to two sham corporations set up by Gopman: Fortune Services, Inc., and Ace Services, Inc. Thus, category 1 of the warrant is properly construed as referring to a very specific, detailed kickback scheme and, so construed, satisfies the particularity requirement of the Fourth Amendment.

**6.** Appellant contends that the affidavit cannot be used to cure the ambiguity in the warrant because it was neither incorporated into the warrant by express reference nor attached to an accompanying warrant. It is true that courts have typically looked for these two factors in deciding whether to consider an affidavit together with a warrant. *See, e.g., In re Property Belonging to the Talk of the Town Bookstore*, 644 F.2d 1317, 1319 (9th Cir. 1981); *United States v. Johnson*, 541 F.2d 1311, 1315 (8th Cir. 1976). These criteria have not been applied rigidly in every case, however. *See, e.g., United States v. Thompson*, 495 F.2d 165, 169–70, 170 n.4 (D.C.Cir.1974). In *United States v. Haydel*, 649 F.2d 1152 (5th Cir.), *corrected*, 664 F.2d 84 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982), for example, we held that an ambiguity in a warrant may be clarified by reference to the supporting affidavit if the affidavit is attached; although the record in *Haydel* was not entirely clear on whether the affidavit was physically attached, the record did indicate that it was available at the search site and that the searching agents knew what they were looking for. 649 F.2d at 1157. Similarly, in the case before us Agent O'Dea's affidavit was brought to the search site, Agent O'Dea was present and had previously explained the contents of the affidavit to the agents and given them an opportunity to read it. Although this question is a difficult one, we believe *Haydel* mandates a more flexible approach than the one urged by appellant.

The requirement that the affidavit be incorporated by and attached to the warrant is intended to insure that both the searchers and the person whose premises are to be searched are informed of the scope of the searchers'

### C. Execution of the Search Warrant

Appellant contends that even if the warrant itself was sufficiently limited, the Strike Force converted the search into a "general exploratory rummaging" in the course of executing the warrant. On the morning of August 3, 1977, Agent O'Dea held a briefing for the ten to twelve agents assigned to the search. O'Dea explained the progress of the investigation and reviewed the warrant and affidavit. The agents were given an opportunity to read the warrant and affidavit. The search party then moved over to the premises of Sage Corporation, where agents were assigned to search specific areas. Searching began that afternoon and continued through the next day, August 4. If an agent found a docu-

authority. *Haydel, supra*, 649 F.2d at 1157. Although self-restraint by searching officers, by itself, may not cure an overbroad warrant, *see Application of Lafayette Academy, Inc.*, 610 F.2d 1, 5 (1st Cir. 1979), we conclude that in this case the searchers were adequately informed of the limitations on the search given their instruction by Agent O'Dea, their opportunity to read the affidavit, and its presence at the search site. As for the need to inform the person whose premises are to be searched, under the peculiar facts of this case we find that this purpose was adequately served. We are mindful that even a total inability to serve the warrant on a property owner does not necessarily render the execution of the warrant unlawful. *See Walter v. United States*, 447 U.S. 649, 658 n.10, 100 S.Ct. 2395, 2402 n.10, 65 L.Ed.2d 410 (1980). Here, the warrant itself and an inventory of items seized was left on the premises. While the affidavit was initially sealed, presumably to protect the secrecy of ongoing Strike Force investigations and grand jury proceedings, *cf. In re Sealed Affidavits to Search Warrants*, 600 F.2d 1256 (9th Cir. 1979), the record indicates that the affidavit was made available to appellant for use in preparing the motion to suppress. In the ordinary case it is preferable that the person whose premises are to be searched be informed of the searching agents' authority at the time of the search; however this was done so far as practicable in this case, and appellant was provided with all the relevant information at a reasonable time thereafter. We conclude the affidavit may be used to explain an ambiguity in the terms of the warrant.

ment he believed fell within the authorization of the warrant, he removed the document and placed it in a box. If the document was part of a file, or was a page in a book or binder, the whole file or volume was removed. Agent O'Dea and Strike Force attorney Steinberg circulated throughout the premises during the search and reviewed the documents being removed. If either O'Dea or Steinberg thought a particular document did not meet the criteria of the warrant, the document was returned to the file. Between 50,000 and 100,000 individual documents were seized, representing one to two per cent of the records on the premises.

Appellant's principal complaint is that the search involved an impermissible exercise of discretion on the part of the searching agents, and that the search was actually controlled by the special individual knowledge of O'Dea and Steinberg (rather than the guidelines supplied by the warrant). Cf. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 325, 99 S.Ct. 2319, 2323, 60 L.Ed.2d 920 (1979) (scope of search cannot be left entirely to discretion of agents conducting the search). We believe the search was reasonable under the circumstances.

 As the District of Columbia Circuit recently observed, the magnitude of a search is insufficient, by itself, to establish a constitutional violation; rather, the relevant inquiry is whether the search and seizures were reasonable under all the circumstances. *United States v. Heldt*, 668 F.2d 1238, 1254 (D.C.Cir.1981), cert. denied, ——— U.S. ———, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982); see also *United States v. Edwards*, 577 F.2d 883, 894 (5th Cir.) (en banc) (thoroughness not necessarily equated with unreasonableness), cert. denied, 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978). While the permissible scope of a search is governed by the terms of the warrant, *Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980), by the same token a search may be as extensive as reasonably required to locate the items de-

scribed in the warrant. *See, e.g., United States v. Diecidue*, 603 F.2d 535, 560–61 (5th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980); see also *Dalia v. United States*, 441 U.S. 238, 257, 99 S.Ct. 1682, 1693, 60 L.Ed.2d 177 (1979) ("it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant"). Many of the same considerations that determined the sufficiency of the warrant's particular description of things to be seized also affect the reasonableness of the search itself; given the complexity of the crimes under investigation and the fact that they would be detected primarily if not exclusively through analysis and synthesis of a large number of documents, a rather extensive search could reasonably be expected.

A complaint similar to appellant's was raised in *United States v. Heldt*, 668 F.2d 1238 (D.C.Cir.1981), cert. denied, ——— U.S. ———, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). In *Heldt*, a search was initially assigned fifty agents but once the search was under way, supervising agents decided an additional fifty agents would be required. Although the original fifty had been briefed in advance on the particulars of the search, the fifty newcomers were not briefed. Noting the need for adequate preparation in such large-scale searches, the court stated:

> In conducting a search of this complexity and magnitude the agents should be familiar with the general nature of the crimes that are charged and the list of items they are authorized to seize, either through reading of the warrant or through adequate instructions or supervision from those in charge.

*Id.* at 1261–62. The court found that "most of the agents conducting the search were provided with as much preparation and information as was reasonable under the circumstances to enable them to carry out the warrant's complicated terms." *Id.* As to the remainder, who were neither briefed

nor had opportunity to review the warrant and affidavit, their presence did not invalidate the search: the search team leaders were available for frequent consultation; copies of the warrant and affidavit were on the premises for their use; and the new agents were teamed up with the agents who had been previously briefed. Most relevant for our purposes was the "final measure" of having the leaders of the search review the documents identified by the agents before making a final determination on whether to seize them. *Id.* The court concluded that on this basis the search as a whole was reasonable.

█ We find the analysis in *Heldt* persuasive. In fact, the search under consideration here was less extensive and involved less risk of overbreadth; all the agents were adequately briefed and supervised in this case. The "final measure" used in the *Heldt* search, moreover, emphasizes that such a double-check procedure, as O'Dea and Steinberg performed, is not necessarily a sign of excessive discretion; in this case as in *Heldt*, this practice indicates an attempt by the "responsible officials . . . to assure that [the search is] conducted in a manner that minimizes unwarranted intrusions into privacy." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11, 96 S.Ct. 2737, 2749 n.11, 49 L.Ed.2d 627 (1976).

It was also reasonable for the agents to remove intact files, books and folders when a particular document within the file was identified as falling within the scope of the warrant. *See United States v. Beusch*, 596 F.2d 871 (9th Cir. 1979). To require otherwise "would substantially increase the time required to conduct the search, thereby aggravating the intrusiveness of the search." *Id.* at 876–77. Also, Agent O'Dea testified that whole files were kept intact so that the agents could identify where individual documents came from and where they belonged if, as was occasionally the case, the document was ordered returned to the files after review by O'Dea or Steinberg. Thus, this procedure clearly facilitated the effi-

cient completion of the search, without leaving the remaining files in total disarray.

D. Adequacy of Hearing on Suppression Motion

█ Appellant contends that the district court improperly limited the hearing relating to execution of the warrant to a review of those documents that the government intended to offer at trial. After a review of those documents the district court found that all the documents to be offered by the government had been properly seized and were admissible. This finding is not clearly erroneous and must be affirmed. Appellant argues, however, that a complete review of all the documents seized was necessary to allow the court to determine whether any of the evidence in the government's case in chief had been tainted by evidence seized outside the scope of the warrant, citing *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

*Alderman* held that once a Fourth Amendment violation is established, the government must disclose to the injured party all of the fruits of the improper search or seizure to enable the party to try to substantiate a claim that evidence at trial was tainted. 394 U.S. at 181–85, 89 S.Ct. at 970–972; *see also United States v. Brown*, 484 F.2d 418, 425 (5th Cir. 1973), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). We find no Fourth Amendment violation in this case. The record indicates, moreover, that appellant in fact was given access before trial to the full inventory of documents in the government's possession. As the district court specifically pointed out to appellant's counsel during the suppression hearing, the party seeking suppression "must go forward with specific evidence demonstrating taint." *Alderman, supra*, 394 U.S. at 183, 89 S.Ct. at 972; *see also United States v. Diecidue*, 603 F.2d 535, 559 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). Despite his access to the government's files, appellant utterly failed to make such a showing.

■ Appellant further argues, however, that a large proportion of the documents seized but not introduced in the government's case in chief were outside the scope of the warrant, suggesting that the search was so overbroad that all the fruits of the search should have been suppressed. Total suppression may be appropriate where the executing officer's conduct exceeds any reasonable interpretation of the warrant's provisions. *See, e.g., United States v. Rettig,* 589 F.2d 418, 423 (9th Cir. 1978). Courts have consistently held, however, that absent a "flagrant disregard" of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized. *United States v. Heldt,* 668 F.2d 1238, 1259–60 (D.C.Cir.1981) (collecting cases), *cert. denied,* —— U.S. ——, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982); *United States v. Cook,* 657 F.2d 730, 735 n.5 (5th Cir. 1981); *United States v. Mendoza,* 473 F.2d 692, 696 (5th Cir. 1972); *Brooks v. United States,* 416 F.2d 1044, 1050 (5th Cir. 1969), *cert. denied,* 400 U.S. 840, 91 S.Ct. 81, 27 L.Ed.2d 75 (1970). *Cf. Andresen v. Maryland,* 427 U.S. 463, 482 n.11, 96 S.Ct. 2737, 2749 n.11, 49 L.Ed.2d 627 (1976). In our previous discussion we held that the execution of the warrant in this case was within constitutional parameters; specifically, the search was performed in a manner intended to minimize the intrusiveness of the search under the circumstances. Thus we see no grounds that would have justified the total suppression of fruits of the search, even assuming that a number of documents seized but not introduced were outside the scope of the warrant.[7] No prejudice to appellant resulted from this aspect of the district court's able handling of the suppression motion.

### E. Allegations of Inaccuracies in Affidavit

Appellant's final argument in support of his motion to suppress is that Agent O'Dea's affidavit contained false statements made intentionally or with reckless disregard for their truth. This claim is governed by *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In summary form, appellant's complaints were as follows: O'Dea relied on information gained from a non-governmental informant, Daniel Milano, although this individual in fact had little first-hand knowledge of the events in question and had a poor reputation for veracity; O'Dea characterized certain transactions as illegal without adequate investigation and despite contrary evidence within his control; and in general O'Dea made unsubstantiated allegations with reckless disregard for their truth or falsity.

The district court expressed serious doubt whether the allegations, together with affidavits offered by appellant, were sufficient to meet the initial burden required by *Franks* before a hearing is required.[8] Nevertheless, the court proceeded to allow testimony on this issue. The court initially set aside two hours for the *Franks* issue, but later announced that the hearing would continue the remainder of the day if necessary. At the hearing, appellant's counsel examined Agent O'Dea at length. Appel-

---

**7.** We note also that it is readily understandable why a large number of documents seized might not have been used in the government's case in chief against appellant, considering that the primary object of the search was to gather evidence in the investigation of Gopman and others.

**8.** *Franks* provides as follows:
There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons .... Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.
438 U.S. at 171–72, 98 S.Ct. at 2684–2685.

lant also called a certified public accountant, in an attempt to show that Fortune Services and Ace Services were not "sham" corporations as described in O'Dea's affidavit, and Agent Mierow, who had participated in the Gopman investigation. After this testimony, appellant's counsel indicated that he had one further witness, a Mr. Wallace, who he had been unable to locate. The district court ordered a recess until the following morning to allow Mr. Wallace to appear. In response, appellant's counsel stated "that should conclude our presentation of evidence." Wallace did not appear the following morning and consideration of the *Franks* issue was concluded. Appellant unsuccessfully urged the court to allow further time in order to procure the testimony of Milano, who was under the supervision of the federal witness protection program, and Seymour Gopman, who was by that time incarcerated in a federal prison.

In its ruling on the motion to suppress, the district court stated that in retrospect he believed appellant had failed to meet the preliminary *Franks* showing mandating a hearing, but that even after a "full evidentiary hearing and review of testimony taken before the magistrate," the appellant had completely failed to establish that O'Dea either intentionally falsified his affidavit or made any statements with reckless disregard for their truth. In addition, the court found that the affidavit contained sufficient allegations to support probable cause even if the disputed language was deleted.

■■■■ Because the court allowed appellant to present evidence on this issue, we will not consider whether appellant's allegations and offer of proof were sufficient to require a hearing under *Franks*. *See United States v. Martin*, 615 F.2d 318, 328 (5th

Cir. 1980). Based on the evidence introduced, the district court's conclusion that no intentional or reckless falsity occurred is certainly not clearly erroneous; indeed this conclusion is supported by the entire record. At most, appellant's presentation raised a suggestion that O'Dea negligently failed to analyze all the available data before drawing his conclusions, or that he was simply mistaken as to the significance of various transactions. Even if proven, however, such "[a]llegations of negligence or innocent mistake are insufficient." *Franks, supra*, 438 U.S. at 171, 98 S.Ct. at 2684. *See also United States v. Astroff*, 578 F.2d 133, 136 (5th Cir. 1978) (*en banc*); *cf. United States v. Young Buffalo*, 591 F.2d 506, 511 (9th Cir.) (no intentional misstatement involved in attempt to "synthesize" results of complex investigation into cogent affidavit), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979).

■■■■ Appellant argues that the hearing was rendered inadequate by the district court's failure to allow more time so that he could seek testimony from Milano and Gopman. We disagree. A district court may limit the number of defense witnesses without depriving a defendant of due process, particularly when there is no offer of proof as to the substance of the proposed witness' testimony and its materiality, or when the testimony would be cumulative or irrelevant. *Fast v. Wainwright*, 439 F.2d 1162, 1164 (5th Cir. 1971); *see also United States v. Henry*, 560 F.2d 963, 965 (9th Cir. 1977); *United States v. Haynes*, 554 F.2d 231, 234 (5th Cir. 1977) (citing Federal Rule of Evidence 403).[9] We have consistently held that a request for continuance in order to procure additional witnesses is a matter within the sound discretion of the district court, and when the request is denied an appellant

---

**9.** *Cf., McCray v. Illinois*, 386 U.S. 300, 312–14, 87 S.Ct. 1056, 1062–1064, 18 L.Ed.2d 62 (1967) (government's failure to identify or produce informer during preliminary hearing not violation of due process of Sixth Amendment). We are also mindful that while due process requires a "hearing appropriate to the nature of

the case . . . , the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself." *United States v. Raddatz*, 447 U.S. 667, 677, 679, 100 S.Ct. 2406, 2414, 65 L.Ed.2d 424 (1980).

must show an abuse of discretion and specific, substantial prejudice in order to obtain relief. *United States v. McDonald*, 672 F.2d 864, 865 (11th Cir. 1982); *United States v. Albert*, 595 F.2d 283, 286–87 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979); *United States v. Alvarez*, 591 F.2d 10, 11 (5th Cir. 1979); *United States v. Uptain*, 531 F.2d 1281, 1287 (5th Cir. 1976).

■■■ Appellant failed to articulate, at the time he requested the district court to allow further testimony, the nature of the anticipated testimony or why its absence would materially prejudice his presentation. Conclusory statements that the proposed testimony would be "relevant" are insufficient. However, the record reveals that at an earlier stage of the pretrial proceedings appellant did explain why he sought the testimony of Milano and Gopman. Appellant apparently intended to show that Milano's information was hearsay, that Milano was suffering from a mental impairment and was a drug user at the time he provided the information, and that he made a "deal" with the government to provide information. Such a showing would not have aided the *Franks* claim; affidavits may be based on hearsay, *see, e.g., United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965), and an attack on the veracity of a non-governmental informant is not grounds for relief under *Franks. See Franks, supra*, 438 U.S. at 171, 98 S.Ct. at 2684; *In re Search Warrant Dated July 4, 1977*, 667 F.2d 117, 137 (D.C.Cir.1981) *cert. denied*, —— U.S. ——, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982); *United States v. Arrington*, 618 F.2d 1119, 1125 (5th Cir. 1980), *cert. denied* 449 U.S. 1086, 101 S.Ct. 876, 66 L.Ed.2d 812 (1981).

■■■ As for Gopman, appellant anticipated that he would deny the existence of a kickback scheme, or that Fortune Services, Inc., or Ace Services, Inc., were "sham" or "phony" corporations. Appellant did introduce evidence on the same subjects through

his other witnesses, however, and the district court was well aware of appellant's contention that the affidavit's description of the kickback scheme was inaccurate and not supported by evidence. In short, Gopman's testimony evidently would have been in part cumulative, in part conclusory, and would have contributed very little to the issue of whether Agent O'Dea made any intentional or reckless statements in his affidavit. It is apparent that neither witness would have provided relevant evidence in aid of the *Franks* claim; accordingly, no significant prejudice could possibly have resulted from the termination of the hearing without their testimony.

## II—VENUE

Count 9 of the indictment charged appellant with submitting false and fraudulent statements to a FDIC-insured bank in Chicago, in violation of 18 U.S.C. § 1014 (1976). Appellant contends that the appropriate venue for this offense was the Northern District of Illinois, where the bank was located, and accordingly Count 9 should have been dismissed for improper venue. The district court denied appellant's motion to dismiss Count 9, without prejudice to a renewal of the motion at trial.

■■■ A violation of section 1014 is indictable either in the district where the false statement is prepared and mailed, or where the statement is received. *See United States v. Zwego*, 657 F.2d 248, 251 (10th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1275, 71 L.Ed.2d 460 (1982); *United States v. Ruehrup*, 333 F.2d 641 (7th Cir.), *cert. denied*, 379 U.S. 903, 85 S.Ct. 194, 13 L.Ed.2d 177 (1964). This is the general rule of venue under the various false statement and false claim statutes. *See, e.g., United States v. Blecker*, 657 F.2d 629, 632 (4th Cir. 1981) (18 U.S.C. § 287), *cert. denied*, —— U.S. ——, 102 S.Ct. 1016, 71 L.Ed.2d 304 (1982); *United States v. Herberman*, 583 F.2d 222, 226–27 (5th Cir. 1978) (18 U.S.C. § 1001). In addition, the government need

only establish proper venue by a preponderance of the evidence, not by proof beyond a reasonable doubt. *See United States v. Rivamonte*, 666 F.2d 515, 517 (11th Cir. 1982); *United States v. White*, 611 F.2d 531, 534–35 (5th Cir.), *cert. denied*, 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 849 (1980). As we said in *Rivamonte*, "evidence of venue need not be direct; when circumstantial evidence as a whole reasonably supports the inference that the crime was committed in the trial district, the government's burden is satisfied." 666 F.2d at 517 (cites omitted).

 There is no dispute that the documents underlying Count 9 were prepared in the Southern District of Florida. At trial, however, appellant tried to show that it was probable the documents were not mailed, but were hand-carried by appellant and presented to the bank in Chicago. No witness could recall exactly whether the documents were mailed or hand-carried. Assuming that preparation and execution alone would be insufficient and that mailing from Florida was also required, we believe there is sufficient evidence, under the standard just reviewed, to conclude the documents were mailed. Sage's office administrator, Hays, who authored and signed the cover letter in the package of documents, testified it was probable, from normal practice, that the documents were mailed. The bank officer who acknowledged receipt on behalf of the bank president indicated that it was his responsibility to open the president's mail, although in person presentations were not unheard of, and the loan officer on the Sage account did not recall seeing appellant in Chicago around this time. Finally, the cover letter was dated April 20, 1977, and receipt was acknowledged April 25, 1977. *Cf. De Rosier v. United States*, 218 F.2d 420, 423 (5th Cir.) (two day interval between date of letter and receiving stamp supports inference of mailing), *cert. denied*, 349 U.S. 921, 75 S.Ct. 660, 99 L.Ed. 1253 (1955). This evidence supports a reasonable conclusion that the documents were prepared, executed and mailed from Florida, and accordingly venue was proper.

## III—ADMISSIBILITY OF AGENT MICHALAK'S TESTIMONY

Part of the government's case relating to the tax evasion charges was that appellant had failed to report as income an ownership interest in recreational leases from the Golden Horn Condominiums. Appellant desired to bring before the jury a statement allegedly made by appellant's accountant, Joseph Spina, in a conversation with another accountant, John Pitcher, to the effect that Spina was surprised and concerned that the interests had not been reported because he was aware of them and therefore he presumed that their absence was either his fault or that of his employees. Spina was under investigation by a grand jury in a separate proceeding, however, and the district court had determined earlier in the trial that Spina would invoke his privilege against self-incrimination in response to any questions concerning his work for appellant or Sage corporation. Accordingly, Spina was declared unavailable and appellant was able to introduce the desired statement through the recollection of Pitcher, under Federal Rule of Evidence 804(b)(3) (statement against interest; declarant unavailable).

 On rebuttal the government placed IRS Agent Michalak on the stand. Michalak testified that in a conversation with Spina, Spina told him that in April 1975, before the returns in question were filed, appellant had disavowed any interest in the recreation leases. This testimony was plainly admissible, as an inconsistent statement of a declarant, to impeach Spina's credibility under Federal Rule of Evidence 806.[10] *See United States v. Lawson*, 608 F.2d 1129, 1130 (6th Cir. 1979), *cert.*

---

**10.** Rule 806 provides as follows:

When a hearsay statement . . . has been admitted in evidence, the credibility of the de-

*denied*, 444 U.S. 1091, 100 S.Ct. 1056, 62 L.Ed.2d 779 (1980). Appellant argues, however, that it would be unfair to apply Rule 806 to this case because the admission of the initial hearsay statement was based on Spina's unavailability, and this unavailability was due to the government's refusal to extend use immunity to Spina for his testimony. This argument completely misses the mark. Assuming immunity had been granted and appellant was able to use Spina himself, presumably Michalak's testimony concerning Spina's inconsistent statement would still have been used to impeach his credibility. It is difficult to see how the government unfairly took advantage of the decision not to offer Spina immunity, as the appellant urges, when the government's use of Michalak's testimony was in no way reliant on whether Spina was available or not.[11] Michalak's testimony was properly admitted.

## IV—SUFFICIENCY OF THE EVIDENCE

Appellant contests the sufficiency of the evidence underlying his conviction on each count. The test for sufficiency of the evidence is whether a reasonable jury could find the evidence supports a conclusion of guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Long*, 674 F.2d 848, 853 (11th Cir. 1982); *United States v. Bulman*, 667 F.2d 1374, 1377 (11th Cir. 1982); *United States v. Hewitt*, 663 F.2d 1381, 1384 (11th Cir. 1981). When applying this test we view the evidence in the light most favorable to the

government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). This standard of review is equally applicable to direct or circumstantial evidence. *See United States v. Rice*, 652 F.2d 521, 526 (5th Cir. 1981); *United States v. Hilburn*, 625 F.2d 1177, 1180 (5th Cir. 1980). In addition, credibility choices are solely within the province of the jury, and we must accept whatever choice supports the jury's verdict. *Hewitt, supra.*

■ Under these guidelines there is sufficient evidence to support the jury's verdict. In general, we find that appellant is offering the same excuses, explanations and attacks on the credibility of witnesses that he offered to the jury, and that the jury was entitled to reject these contentions. We will briefly review appellant's principal complaints.

Count 7 charged appellant with mail fraud, 18 U.S.C. § 1341 (1976), under the following circumstances:[12] In November 1972, Teachers Insurance and Annuity Association, headquartered in New York, issued a loan commitment to Sage for $475,000 for the Andrews Office Building project. As a condition of the loan, appellant was required to produce executed leases showing a required minimum occupancy level, and original tenant estoppel letters, prior to the closing date. The government charged that appellant ascertained the building was not adequately leased, and decided to submit false documentation. Steven Brody, head of Sage's commercial rental division, testified that at appellant's di-

clarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with his hearsay statement, is not subject to any requirement that he may have been afforded an opportunity to deny or explain.

**11.** We nevertheless note that the decision whether to grant immunity to a witness is entirely entrusted to the executive branch, *see, e.g., United States v. Chagra*, 669 F.2d 241, 258–61 (5th Cir. 1982); *United States v. Thevis,*

665 F.2d 616, 639 (5th Cir. 1982) (Unit B) *petition for cert. filed,* 50 U.S.L.W. 3918 (U.S. May 10, 1982) (No. 81–2073), and that in the absence of a showing of government misconduct the failure to grant immunity does not alter the "unavailability" of a witness who asserts the privilege against self-incrimination. *See United States v. Lang*, 589 F.2d 92, 95–96 (2d Cir. 1978).

**12.** Count 1C charged the same transactions as a RICO predicate offense.

rection he prepared several packages of documents, in August 1974 and February and March 1975, for submission to Teachers containing falsified leases and estoppel letters. Appellant prepared cover letters and forwarded the documents to Teachers' local agent, who mailed the packages to Teachers in New York.

Appellant points to evidence that the lender's occupancy requirement did not have to be met until March 31, 1975, and that the actual tenants of Andrews Office Building would apparently have signed estoppel letters if requested to do so. Appellant also argues that Brody's testimony was not corroborated by one individual whom Brody said participated in a meeting in which the false documents were discussed. As for the latter argument, the jury has assessed Brody's credibility and resolved conflicts in the testimony, and we see no reason to upset those determinations. The former argument may demonstrate the irony of appellant's decision to prepare false documentation, but in no way contradicts the evidence that such preparation occurred. Finally, appellant argues that use of the mails was collateral to the scheme, because the documents were hand-delivered to and initially reviewed by Teachers' local intermediary. It is clear, however, that the mailing of the documents to Teachers was anticipated and that this mailing was an integral part of the scheme. *See United States v. Kent*, 608 F.2d 542 (5th Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980); Project, *White-Collar Crime: Second Annual Survey of Law*, 19 Am.Crim.L.Rev. 173, 291–92 (1981).

Regarding Count 1D, alleging a violation of 18 U.S.C. § 1954 (1976) (offer, acceptance or solicitation to influence operations of employee benefit plan), it is undisputed that appellant transferred interests worth approximately $83,000 to Gopman, as counsel to an employee welfare benefit plan, in consideration for Gopman's proposal that the Fund make a $500,000 loan to one of Sage's projects. Although the Fund had not previously made such loans, the loan was approved after Gopman's detailed presentation and assurances. These facts clearly make out a violation of section 1954.

Count 2 concerned a loan from the Southeast Florida Laborers District Council Pension Fund, of which appellant received $191,654.67. The government produced evidence that the land pledged by appellant as collateral for this loan was vastly overvalued and offered very little security. Appellant contends that the administrator of the Fund, Bernard Rubin, was unconcerned with the security of the loan, but had made the loan to keep Sage Corporation afloat as a major employer of union labor. In addition, appellant points out that the maturity date of the loan had not yet arrived at the time of indictment. Nevertheless, counsel for the fund testified the loan was in default at the time of trial. The evidence justified the jury's conclusion that appellant had converted the funds to his own use. *Cf. United States v. Waronek*, 582 F.2d 1158, 1161 (7th Cir. 1978) (intent to permanently deprive owner of property not an element of embezzlement); *United States v. Daley*, 454 F.2d 505, 510 (1st Cir. 1972) (possibility of future recovery of funds does not preclude criminal liability).

Counts 5 and 6 charged two incidents of mail fraud, 18 U.S.C. § 1341 (1976), both relating to administration of an escrow account established for Drake Towers, a condominium project constructed by Sage. Under the terms of the escrow, proceeds from the sale or lease of condominiums would be placed in the account and Sage would send periodic statements of receipts and disbursements to the lender. On the two occasions underlying Counts 5 and 6, appellant instructed his office administrator, who was preparing the required statements, to "forget about" or show as void several checks written on the Drake Towers account. The checks were either made payable to appellant or to "cash"; the latter were endorsed by appellant. As a result, the statements received by the lender indi-

cated a balance substantially higher than the actual balance in the account. Although appellant elicited testimony that he had explained this procedure to the administrator by saying he would replenish the sums as soon as anticipated funding came through, the lender was clearly deceived as to the administration of these funds. The lender eventually foreclosed on the underlying loan; apparently none of the sums reported in the periodic accounting statements of the escrow account were recovered. The evidence supporting Counts 5 and 6 was more than adequate.

Count 8 charged a further mail fraud incident as follows: appellant provided a false statement of Sage's financial condition that was submitted to the Florida Department of Insurance as part of an audit of the Farmers' National Life Insurance Company. Sage and Farmers had engaged in various transactions, the end result of which was to increase the net worth of Farmers, in anticipation of the audit. During the audit an Insurance Department official noticed a debenture with Sage as obligor listed as an asset on Farmers' books. The official then requested information on Sage, including a financial statement. Farmers obtained this information from Sage and mailed it to the Insurance Department. There is apparently no dispute that the financial statement provided by Sage was not accurate, and that the statement was part of a scheme to deceive the insurance authorities. Appellant argues only that there was no evidence that he himself provided the statement, or that he could have foreseen that it would be sent through the mail. The president of Farmers testified, however, that he spoke with appellant directly, asked him to supply the statement, and appellant replied that he had one he would make available to Farmers. The president had also advised appellant that the statement had been requested by the Department of Insurance; the department is located in Tallahassee and the offices of Farmers is located in Miami. The evidence was sufficient to support the conclusions that appellant furnished the statements, and that use of the mails was reasonably foreseeable. *See United States v. Bright*, 588 F.2d 504, 510 (5th Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979).

Count 9 charged the submission of a false statement to the North Bank of Chicago, Illinois, in support of a loan to W & R Corporation, a Sage subsidiary, in violation of 18 U.S.C. § 1014 (1976). The financial statement for W & R submitted to the bank, dated December 31, 1976, indicated the corporation was solvent and had had receipts and income in the preceding eight months. The bank officer assigned to this loan testified that he had placed reliance on this statement. The government introduced evidence, however, that W & R Corporation was dormant by the end of 1976, and pointed out several other apparent deviations from normal procedure in connection with the statement. Although appellant argues the evidence failed to show the statement was materially false, this question was for the jury and there is sufficient evidence to support their conclusions. *See United States v. Greene*, 578 F.2d 648, 657 (5th Cir. 1978), *cert. denied*, 439 U.S. 1133, 99 S.Ct. 1056, 59 L.Ed.2d 96 (1979).

We also conclude there was sufficient evidence that appellant understated his income on his individual income tax returns as charged in Counts 10 through 13. Each count charged understatement of income for a separate year. The government identified three categories of omitted income: income generated in each year from appellant's interest in various recreation leases from condominium projects; $75,000 derived from appellant's officers' loan account in 1974; and $555,000 derived from a loan in 1976. While appellant does raise a significant question whether the $75,000 was taxable income, and also argues the $555,000 was not adequately described by the evidence to determine whether it represented economic gain to appellant, we need not pursue these matters. The omission of ap-

pellant's interest in the recreational leases was adequately shown for each year charged in the indictment; accordingly, the convictions for understatement of income must be affirmed.

## V—CONCLUSION

In summary, we have found no reversible error in the arguments raised by appellant. His convictions are therefore affirmed.

AFFIRMED.