# United States Court of Appeals
## For the First Circuit

No. 09-1889

UNITED STATES OF AMERICA,

Appellee,

v.

LENARD CHRISTI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter, Associate Justice,[*]
and Boudin, Circuit Judge.

David A.F. Lewis for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

June 19, 2012

---

[*]     The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice.**    In this appeal from convictions for bank fraud, wire fraud (as well as conspiracy to commit these offenses), and money laundering, Lenard Christi claims insufficiency of the evidence to show anything more than his mere (innocent) presence at some events in the sequence of the transactions charged, and abridgement of his Sixth Amendment right to jury trial when the trial judge closed the courtroom doors during jury instructions.  We affirm.

In the course of a year and a half in 2000-2002, Christi and a co-defendant, Robert Felleman, were associated in five instances of depositing large checks (one for $15,000,000) in three different bank accounts (the one involved here being in the name of a defunct corporation), and then writing checks against the resulting, ostensible account balances or requesting substantial wire transfers from them.  In none of the five was the check good.  In this instance, one for about $320,000 from an entity called Allied Building Products was deposited by mail in the corporate account, seemingly endorsed over to the moribund entity by Christi, the apparent payee.  Four days later, Christi and Felleman visited a branch of the bank to arrange for a transfer to an account in Taiwan of $220,000 from the balance stated after the deposit.  Felleman began a series of other withdrawals against the funds that day, and on the next he and Christi went to the bank to withdraw a further $20,000; four wire transfers were made from the supposed

-2-

funds to payees in Nigeria, two of them arranged by Christi. Subsequently the Allied Products check was dishonored as having been altered and was returned unpaid; it had been written in the amount of $268.96 and was not payable to Christi. Felleman and Christi gave disparate accounts of the transaction and were subsequently indicted for conspiracy to commit bank and wire fraud, 18 U.S.C. § 371, bank fraud, 18 U.S.C. § 1344, wire fraud, 18 U.S.C. § 1343, and money laundering, 18 U.S.C. § 1957, Christi being charged both as a principal and as aiding and abetting Felleman's activities. Felleman negotiated guilty pleas, and Christi was convicted.

The scope of the issue of evidentiary insufficiency, raised by claiming entitlement to acquittal that could have been requested under Federal Rule of Criminal Procedure 29 on the bank and wire fraud and laundering charges, is subject to three limitations, the first stemming from Christi's failure to raise the claim at trial. At the close of the Government's evidence his counsel did make a Rule 29 motion, but on the ground that the description of the wire fraud was not sufficiently distinct from the laundering charge to satisfy the requirement that the source of laundered money be a separate criminal activity known to the defendant. See United States v. Seward, 272 F.3d 831 (7th Cir. 2001). Here, however, he says nothing about this issue, but argues instead that the evidence and its plausible implications fall short

-3-

of supporting rational inferences of guilt beyond a reasonable doubt. See United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009). As a consequence, we review only for plain error, considering whether submission of the three charges to the jury was erroneous, plainly so, prejudicial, and compromising to the fairness and integrity of the judicial proceeding. See United States v. Rivera-Rivera, 555 F.3d 277, 285-86 (1st Cir. 2009).

The appeal is limited and simplified, secondly, by the fact that Christi does not contest the commission of the offenses by Felleman. It is therefore a given that the evidence shows that he, at least, committed the two varieties of fraud and engaged in the money laundering.

Finally, Christi is forced to show that the evidence failed to support a finding that he committed the offenses even by aiding and abetting Felleman in his crimes, for Christi was charged as an accessory as well as a principal with respect to each of the substantive offenses. That is, he must demonstrate that the evidence would not support so much as an inference that he "associated with [Felleman's] venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." See United States v. Colón-Muñoz, 192 F.3d 210, 223 (1st Cir. 1999). This he cannot do.

Christi argues that his status as innocent bystander is a reasonable possibility owing to the facts that the endorsement on

the Allied Products check was apparently not his signature, that Felleman did most of the talking at the meeting to arrange the $220,000 wire transfer, and that Felleman was the signatory on the checks for smaller amounts drawn against the illegitimate deposit. But there is too much inculpatory evidence to allow for any conclusion, let alone a plain one, that it was unreasonable for the jury to infer that he was taking part in an effort to bring the fraudulent scheme to a successful end.

To begin with, of course, he could hardly claim with a straight face that he just happened to be accompanying Felleman in his bank appearances, in light of the evidence associating him with four other efforts involving phony checks and claims from non-existent funds. In fact, he described himself as Felleman's business associate and worked out of an office of the defunct corporation, whose listed headquarters were apparently unpopulated save for him (and presumably Felleman). On his visit to the bank when Felleman dominated the discourse his own remarks contributed to an atmosphere of good-natured affability, and his presence would have preempted any question the bank official might have had about the regularity of the endorsement of the Allied Products check to the corporation. And while it is true that Felleman signed checks drawn against the balance of the proceeds after the wire transfer had been ordered, Christi actively arranged for at least two

subsequent wires of funds from the ostensible balance in the account.

If that were not enough, Christi nailed down the Government's case by lying about the circumstances of the transaction in his inconsistent accounts afterwards. See United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011). When the bank's investigator asked about the apparently fraudulent series of transactions, Christi did not deny knowledge of the deposit and claimed that the funds supposedly represented by the check had come from someone named Danlodi, to cover taxes due in connection with a commercial development on the Caribbean Island of St. Kitts. When the FBI first interviewed him, the ultimate source of the funds had become a Nigerian lawyer, who had instructed that money be wired to Taiwan. And when the same FBI agent interviewed him again over three years later, the transaction that generated the Allied check involved Keystone Oil, acting through a Dutch engineer named Christian Eze.

In sum, a jury could reasonably find that Christi was associated with Felleman in an effort to get money from a bank to be wired to a foreign country for later disposition. The first step was to cash a fraudulent check, replicating a series of schemes too many in number to allow for doubt about Christi's knowledge of their fraudulent character. His presence and sociability lent a note of regularity to the meeting at the bank to

arrange disposition of the bulk of the Allied Products funds, which he himself depleted further by lesser wire transfers. He admitted his association with Felleman in a business conducted from a lonely office in the name of a corporation that had disappeared, leaving nothing behind but the name on a bank account receiving the proceeds of fraud. When exposure came he responded with serial, clumsy lies meant to put a coating of legitimacy on the criminal activity. At the least, his actions amounted to association, participation, and action aimed at the success of the scheme, and thus to aiding and abetting Felleman's fraud in getting and disposing of the funds, if not to full principal involvement. There was no error in the inferences of Christi's guilt.

Christi's second claim of error goes to limiting public access to the courtroom during the better part of the jury instructions, but we think he waived any such claim. The court apparently began the charge with the courtroom doors open, but interrupted the proceeding with a short break for some clerical task. Before resuming, the judge notified spectators, who he understood were waiting for the next case, that if they stayed they would have to remain until the instructions were over, for he was going to lock the door. Christi's lawyer made no objection and made none later when counsel were invited to raise any objection to the charge. At the end of the afternoon and before any verdict, when the jurors were about to leave for the night, the prosecutor

approached the judge to mention the locked courtroom door and the structural character of a defendant's Sixth Amendment right to public trial. He replied to a question from the judge by saying the Government had not been prejudiced, and a moment later stated twice that no one had been adversely affected by closing the door for the balance of the instructions. He said that in his opinion there was "no issue whatsoever" about it, but that he just wanted a record on the matter. Christi's lawyer was there throughout the exchange but spoke not a word on the record, except to bring the colloquy to a close by saying that she had to leave for a prior commitment.

Even though his lawyer stood silent during the substantive discussion of the public trial right and the significance of stopping traffic in and out during the charge, Christi now says his Sixth Amendment right was violated when the doors were locked. If he had merely failed to object and the court's action had not otherwise been addressed, he could invoke plain error review, see United States v. Scott, 564 F.3d 34, 37 (1st Cir. 2009), but the circumstances of defense counsel's failure to speak on the matter here shows that her silence passed beyond inadvertence or passivity to the point of waiver. Although the trial judge did not in so many words request an affirmative declaration of position from defense counsel in response to the Government's statement for the record, the exchange between the

-8-

court and the prosecutor placed the subject matter unmistakably on the table, and the defense's silence is reasonably understood only as signifying agreement that there was nothing objectionable. The court said to the two lawyers, "the issue . . . has to be raised by someone who is adversely affected by it." This statement was the practical equivalent of an express invitation to object, cf. United States v. Jimenez, 512 F.3d 1, 6-7 (1st Cir. 2007), and defense counsel had to know she was on the spot to speak up or waive any claim.

It is of no matter to this waiver analysis that a violation of the Sixth Amendment public trial right is structural, as distinct from merely trial error. See United States v. Owens, 483 F.3d 48, 63 (1st Cir. 2007). The structural character means only that if Christi could now raise the issue he would not need to show any particular prejudice if otherwise entitled to relief. See id. While there is some question whether Article III structural error may be waived (that is, error in assigning certain Article III judicial functions to a magistrate judge), that question arises only because the values protected are substantially institutional rather than individual, see Peretz v. United States, 501 U.S. 923, 937 (1991) (citing Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 850-51 (1986)). Indeed, In Peretz, the Supreme Court expressly cited Levine v. United States, 362 U.S. 610, 619 (1960) for the proposition that a failure to object to closing a courtroom

waives any claim of infringement to a right of public trial.[1]  The Sixth Amendment claim having been waived, there is no occasion to consider whether closing the doors in this case was objectionable under Scott.

**Affirmed**.

---

[1]It is not significant, as Christi claims, that the public trial right in Levine was provided by the Fifth Amendment Due Process Clause, owing to the fact that the issue arose in a criminal contempt proceeding, which is not a Sixth Amendment "prosecution[]."  As the Court explained, the values protected are the same in each case.  Levine, 362 U.S. at 616.