[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13822

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

RONALD TAI YOUNG MOON, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:19-cr-00324-ACA-HNJ-1

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

HULL, Circuit Judge:

This case begins, as many criminal cases do, with a search warrant. A federal task force conducted a year-long investigation, presented the fruits of their labor to a magistrate judge, and received authority to search for evidence tending to prove that their subject, a medical doctor, was engaged in healthcare fraud and the illegal distribution of opioids and other pain pills.

In January 2019, the task force executed that search warrant on a medical clinic, The Industrial Athlete, which was owned and operated by Ronald Tai Young Moon, Jr., a physician in Birmingham. The medical and patient files they searched are not in the record before us.

Rather, this case involves what the task force found in a cluttered back room used only by Moon. A bag full of videotapes under a desk. Some stacked on the desk. Some on a shelf nearby. The room also contained a television with a VCR, so an agent started playing the tapes, roughly a minute of each one, to see if they might be relevant to the crimes the agent was there to investigate. About fifteen tapes in, to the agent's surprise, this stopped being a case about drugs.

The tapes were seized immediately. A new federal search warrant was obtained, so different investigators could review the tapes in full. And after a three-day jury trial, Moon was convicted

of production of, attempted production of, and possession of child pornography.

Moon caught the district court by surprise, too, when he moved for a new trial arguing that his Sixth Amendment rights were violated when it closed the court during certain witnesses' testimony. The court was surprised because Moon agreed to some closures and never once objected to the others. It denied his motion.

Moon appeals his convictions. After review and with the benefit of oral argument, we affirm.

## I.    FACTUAL BACKGROUND

### A. The Search Warrant Application

Moon was a practicing physician who owned and operated The Industrial Athlete, a medical clinic in Birmingham. Moon specialized in pain management.

In January 2019, Drug Enforcement Agency (DEA) task force officer Jason Green applied for a warrant to search The Industrial Athlete. In his 55-page affidavit in support of the application for a search warrant, Officer Green stated his belief that probable cause existed to believe that Moon was operating a "pill mill." Officer Green defined "pill mills" as "organizations that illegally distribute or dispense controlled substances, including opiate-based narcotics, under the guise of operating seemingly legitimate medical clinics." Officer Green averred that there was probable cause to believe that Moon's clinic contained

evidence of violations of 21 U.S.C. § 841 (illegal distribution and dispensing of controlled substances) and 18 U.S.C. § 1347 (health care fraud).

Officer Green recounted that law enforcement had been investigating Moon's prescribing practices since late 2017. Investigators had obtained data for prescriptions written by Moon from 2014 to 2018, and that data exhibited signs "of a typical pill mill." For example, in each of those years, Moon wrote more than 12,000 narcotic prescriptions. For the entire 2014 to 2018 period, Moon ranked number 15—out of 13,425 physicians, nurse practitioners, and physician assistants—in quantity of controlled substances, and number 23 in quantity of opioids, prescribed and filled in Alabama.

In addition, the data showed that Moon regularly wrote prescriptions with dosages above the Center for Disease Control's (CDC) recommendations for chronic pain. Citing a CDC guideline published March 18, 2016, Officer Green explained that the recommended opioid dose was no more than 90 morphine milligram equivalents per day (MME/day), and that providers should take extra precautions when prescribing any amount above 50 MME/day. However, from 2015 to 2018, Moon wrote more than 11,300 narcotic prescriptions with a dosage higher than 90 MME/day.

Officer Green explained that investigators also obtained documents from health insurer BlueCross/BlueShield (BCBS) relating to BCBS's audits and analyses of Moon's claims in 2014,

2015, and 2016.  According to those records, BCBS sent letters to Moon in May 2015, February 2016, and June 2016 describing a concerning pattern of "upcoding"—meaning that BCBS believed that Moon was "submitting claims . . . for more comprehensive, time-intensive services than Moon was (or could realistically be) performing."  For example, the February 2016 "letter stated that, based on estimates of the time needed to complete the services for which Moon was submitting claims, between October 2014 and October 2015 Moon billed 24 hours or more of service per day 46% of the time."  In the letters, BCBS noted that Moon's billing practices were outside the norm compared to Moon's peers.

Officer Green also described evidence resulting from investigators' interviews with several witnesses.  Among them was Angela Blackwell, a pharmacist who worked near Moon's clinic.  According to Officer Green, Blackwell stated that most prescriptions from Moon were "pre-printed" or "pre-filled out." Blackwell had refused to fill numerous prescriptions from Moon because they prescribed an opioid, a benzodiazepine, and a muscle relaxant, which was a dangerous drug cocktail.

Next, Officer Green described what investigators witnessed while surveilling Moon's clinic on several days in June and July 2018.  The clinic was very busy each time the investigators surveilled it—even shortly after it opened at 2 a.m.—and investigators saw vehicles registered to individuals who lived

more than 100 miles away in Alabama, as well as vehicles from Georgia, Kentucky, and Tennessee.

Finally, Officer Green averred that the DEA hired a pain management expert, who reviewed Moon's prescription data and concluded that Moon's prescribing practices far exceeded accepted standards for medical practice and that Moon was prescribing drugs in combinations that carried a particularly high risk of overdose.

In the warrant application, Officer Green defined "[t]he terms 'records' and 'documents'" to "include all information recorded in any form, visual or aural, and by any means, whether in . . . photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, *videotapes*, motion pictures, photocopies); . . . ." (emphasis added). Officer Green explained that "this application seeks authority to search for records that might be found in [The Industrial Athlete], in whatever form they are found."

## B.  The Search Warrant

A magistrate judge found that Officer Green's affidavit established probable cause and issued a search warrant. The warrant "applie[d] to information associated with all medical and other records maintained at The Industrial Athlete." It authorized law enforcement to seize "[a]ny records or evidence regarding violations of 21 U.S.C. § 841 or 18 U.S.C. § 1347." It then listed numerous specific items relevant to the search, one of which was:

11. Computers, digital storage media and digital content, which may include, but are not limited to, floppy disks, hard drives, *tapes*, DVD disks, CD-ROM disks, flash storage or other magnetic, optical, or mechanical storage that can be accessed by computers to store or retrieve data, including but not limited to patient records, prescription records, financial records, business records, stored electronic communications, photographs, *video recordings*, and audio recordings.  (Emphases added).

## C.  Agent Wade Green Finds the Videotapes

The DEA task force executed the search warrant at The Industrial Athlete on January 15, 2019.  DEA Agent Wade Green, an investigator in the diversion unit, was among the agents who executed the search warrant.  A few hours in, Agent Green and his partner, Special Agent Jimmy Pope, were directed to search an office that was not yet searched.[1]

Agent Green noticed a small television and VHS combination unit on a chair in the office.[2]  It was plugged in. Agent Green also noticed a hidden camera inside a smoke

---

[1] Several employees later testified that this was Moon's office, Moon generally kept the door locked, and Moon did not let other people inside.

[2] At trial, the government asked Agent Green to describe what a VCR was— "a unit that would play the VHS tapes," he responded—and asked him what a VHS tape was.  Agent Green explained that "VHS tapes preceded DVDs for video recordings"; they "utilized magnetic tape to record audio and video onto them"; and they were "6 or 7 inches wide and a few inches deep."

detector—which he recognized because he had used an identical one in a former job—a manual for a clock radio that contained a hidden camera that transmitted wirelessly, and a device for receiving such transmissions. Under the desk in the office, Agent Green found a black satchel containing videotapes. Agent Green also found videotapes on the desk and to the side of the desk. In all, there were 60 videotapes in the office, some with labels and some without.

Based on his discovery of the hidden camera in the smoke detector, Agent Green believed there was a possibility the tapes could contain footage taken inside the clinic. Agent Green began to watch the videotapes, viewing each for about one minute. He either played them from the point the tape was wound to, or rewound slightly to see the most recent part of the tape that had been viewed. After he reviewed about 15 tapes, some of which contained images of naked adult women, he played a tape and saw that it contained an image of a naked child in a bathroom. At that point, he stopped reviewing the videos.

### D.  Content of the Videotapes[3]

The FBI seized the videotapes and obtained a search warrant specific to child pornography.  FBI intelligence analyst Tina Mauldin reviewed the full contents of all 60 tapes.  The tapes contained a mix of family videos, hidden camera videos, videos that appeared to be secretly filmed using a handheld device, videos that were taped off of a television, and surveillance videos from a clinic.  Many tapes contained adult pornography.

The FBI digitized the contents of 13 of the 60 tapes and placed those contents onto a thumb drive.  The video files were separated into 13 folders and were labeled by Tape Number and Clip Number.  For example, the folder for Tape 1 contained the uncut contents of the first tape, labeled "1A," as well as those same contents cut up into chronological clips, labeled "1A1," "1A2," etc.  Ultimately, Moon's charges stemmed from clips of

---

[3] The contents of 13 videotapes were admitted as evidence at trial but, given their sensitive nature, were not sent to the appellate court.  However, there is sufficient description of the tapes in the trial testimony, the district court's post-trial order, and unobjected-to portions of the Presentence Investigation Report for us to describe their general contents accurately.  Because Moon does not challenge the sufficiency of the evidence supporting his convictions, our description of the tapes' contents is, for all intents and purposes, background information.  If any issues in this case depended on what the videos showed, we would have limited ourselves to what the jury saw or heard and would have requested the video files be securely delivered to us.  But it was simply not necessary here.

covert footage found on Tapes 1, 2, 3, and 4.  Those clips showed the following.

1.  Tape 1

In 2009, several of Moon's daughter's friends spent the night at the Moon house after their Eighth-grade banquet.  Tape 1 contains footage of these girls, all of whom were minors, from a camera that was secretly recording them in a bathroom in the basement of the Moon home.  The bathroom had a sink/vanity area, which the camera was focused on, and a separate toilet/shower area, which could be seen on camera if the door to that area was open.  In total, Tape 1 contained hidden-camera footage of seven 13–14-year-old girls as they entered the bathroom or changed within it.  Five were fully clothed in the clips, and one was shown naked from the waist up.

The seventh child captured in the hidden-camera footage on Tape 1 was fully nude.   In Clip 5 on Tape 1, C.P., who was 13 years old at the time, wears her formal dress as she walks from the sink area to the toilet area and closes the door behind her. She then returns to the sink area wearing a bathing suit.  Clip 9 on Tape 1 shows C.P. taking off her bathing suit in the sink area of the bathroom and drying her hair.  She is fully naked with her pubic area visible.

2.  Tape 2

Tape 2 included secretly taped footage of Moon's niece, A.R., entering a bathroom topless.  She was less than 15 years old at the time.

3.  Tapes 3 and 4

Tapes 3 and 4 contained footage that was secretly taped through the windows of Moon's next-door neighbor's house in the early 1990s.  Many clips showed S.W.—an adult—as she changed in her laundry room.  However, some clips showed S.W.'s twin daughters, K.M. and K.R., who were in middle school at the time.

In Clip 5 on Tape 3, one of the twins[4] is in K.M.'s bedroom and can be seen on the video taking off her shirt.  Clips 1 and 2 on Tape 4 also showed one of the twins naked from the waist up while changing.  In Clip 6 on Tape 4, one of the twins is changing clothes and is shown fully naked.  In that clip, the camera zooms in on the twin and then zooms back out.

## II.    PRE-TRIAL MOTIONS

A superseding indictment charged Moon with two counts of production and attempted production of child pornography, in violation of 18 U.S.C. § 2251(a), (e) (Counts One and Four); two

---

[4] S.W.'s daughters were identical twins and, as children, often wore their hair in the same style.  Thus, K.M. and K.R. both testified that they did not know which one of them was depicted in each video clip.

counts of attempted production of child pornography, in violation of 18 U.S.C. § 2251(a), (e) (Counts Two and Three); and two counts of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2) (Counts Five and Six). Counts One and Five corresponded to the clips of the middle school girls on Tape 1, particularly Clip 9 of C.P. Count Two corresponded to the clip on Tape 2 of A.R. Count Three corresponded to the clip on Tape 3 of K.M. or K.R. And Counts Four and Six corresponded to the clips on Tape 4 of K.M. or K.R., particularly Clip 6.

## A. Moon's Motion to Suppress

Moon moved to suppress the evidence seized from the clinic, arguing that: (1) Officer Jason Green's affidavit submitted in support of the application for a search warrant of Moon's clinic intentionally omitted and misrepresented pertinent facts; and (2) Agent Wade Green's viewing of the tapes during the search exceeded the scope of the warrant. Moon requested a *Franks*[5] hearing for the court to determine whether probable cause supported the search warrant.

At a motion hearing, Moon contended that Officer Jason Green's affidavit was misleading or false in several ways. He argued, among other things, that: (1) Officer Green's application of the CDC guidelines to Moon's prescription data was

---

[5] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978).

20-13822                 Opinion of the Court                          13

misleading and, in part, based on miscalculations; (2) a private investigator spoke to Blackwell, the pharmacist quoted in the affidavit, and she denied making the statements attributed to her in the affidavit; and (3) Officer Green omitted material facts relating to Moon's dispute with BCBS regarding his billing practices.[6]

The district court found that Moon had not shown that Officer Green intentionally or recklessly included misleading statements in, or omitted material information from, the affidavit. It also found that the disputed statements from pharmacist Blackwell could be removed from the affidavit without negating probable cause to support the search warrant. Thus, it denied Moon's request for a *Franks* hearing.

Regarding Agent Wade Green's review of the tapes, Moon argued in his suppression motion that the tapes were outside the scope of the warrant because they contained analog data that could not be "accessed by computers to store or retrieve data." The district court denied Moon's motion to suppress, finding that the warrant's "scope clearly include[d] tapes."

_____

[6] In his motion to suppress, Moon made the conspiratorial allegation that the "genesis of this investigation [of Moon] came from" BCBS providing documents to investigators. Moon argued that Officer Green omitted that the investigation was based on information provided by "an entity with a prior history of dispute with the Defendant related to the very issues contained within the affidavit and with a financial motive against the Defendant." The government denied this allegation, and Moon did not bring it up at the motion hearing.

## B. Moon's Recusal Motion

About six weeks before trial, Moon moved for the judge's recusal because the judge's former law firm represented BCBS, which Moon argued was a material witness in his case. Moon contended that, in determining whether Moon was entitled to a *Franks* hearing, the judge "was forced to make credibility determinations about information coming from BCBS." Moon argued that, although he was no longer in-network with BCBS, the insurer "maintain[ed] a significant financial incentive to put [Moon] out of business completely because they are still required to cover . . . services ordered by [Moon] for BCBS insureds." Moon stated that he did not know if the district court "worked on any BCBS related matters or if she derived any income from fees earned by other attorneys working cases for BCBS" but filed his motion in "an abundance of caution."

The district court denied Moon's motion for recusal. The district court judge stated that she had "never personally represented Blue Cross Blue Shield in any matter." In addition, the judge confirmed with her former law firm that the firm had never represented BCBS in any matter related to Moon. Further, the district court rejected Moon's contention that BCBS was a material witness whose credibility the court had to address.

## III.　TRIAL

### A. The Trial Closure Agreement

Moon's case proceeded to trial.  At a conference the day before trial, the government stated that it intended to ask the court to clear the courtroom of non-essential personnel before it played video clips containing nudity.  The district court responded, "How about we do this so that I can cut off at the pass their objection.  Why don't you approach and say, Hey, this is one of those tapes, and we'll do it that way."  The government agreed that it would approach the bench each time it wished to seek a closure.

On the morning of trial, the parties informed the district court that (1) they had reached an agreement to close the courtroom during the display of sensitive evidence and the questioning that would surround that evidence and (2) they would inform the court when closure was appropriate.[7]

At trial, the government presented twenty-four witnesses over three days, who generally testified to the facts as described above.  Four were involved in the investigation of Moon's clinic or the processing of the tapes.  One was an employee of the tapes' manufacturer, there to testify about when and where the tapes

---

[7] Moon—who is represented by different counsel on appeal than he was at trial—now argues that the parties came to no such agreement.  However, as we will discuss in greater detail below, Moon's own post-trial filings are clear that this agreement did, in fact, exist.

were made.  Five were former employees in Moon's household or clinic.  And fourteen identified themselves and others in the secretly taped video footage.[8]

The trial was closed to the public during all or part of eighteen witnesses' testimony, as follows.

1.  Day 1 of trial

The government first asked the court to close the courtroom during the testimony of its fourth witness, FBI intelligence analyst Tina Mauldin.  After some preliminary questioning, the government stated:

> And at this point, Your Honor, the government would ask permission to play some excerpts, as agreed upon, for the jury and would ask for the courtroom to be closed.

The district court asked the gallery to leave.  Moon did not object. In fact, he requested a sidebar to discuss a separate issue "while the gallery leaves."  When Moon began his cross-examination of Mauldin, Moon did not request that the courtroom be reopened.

After Mauldin's testimony, the government informed the court that a portion of its next examination could be open to the public, but the court would "need to close it" again because the government planned to "play videos."  The district court

---

[8] As described above, some of the secretly taped video footage identified by the witnesses showed individuals who were fully clothed, while other footage showed children or adults who were partially or completely naked.

instructed the court security officer to allow the gallery back in. It said to the government, "I trust that you will let me know when you want me to have the members of the gallery leave." The government responded that it would. Moon did not object.

After preliminary questioning of C.R., a former neighbor of Moon's, the government stated that it was going to play video clips containing sensitive information. It stated that it was not sure that the first video clip contained sensitive information or not but, "out of an abundance of caution," it asked that the courtroom be cleared. The district court instructed the gallery to leave. Moon did not object. During her testimony, C.R. identified secretly taped footage of herself breastfeeding her son and of her adult house-sitter sitting in C.R.'s dining room naked. When Moon began his cross-examination of C.R., Moon did not say anything about the courtroom closure.

2. Day 2 of trial

The second day of trial began with the testimony of L.F.— the house-sitter identified by witness C.R. the previous day. After brief initial questioning, the government told the court that it was going to show some video clips and asked that the courtroom be cleared. The district court instructed the gallery to leave the room. Moon did not object. When Moon began his cross-examination of L.F., he did not say anything about the courtroom closure.

Next, the government called Elaine Ward, whom Moon employed as a house cleaner for more than two decades, at both of the houses he occupied in that time. When it called Ward to the stand, the government told the court that the courtroom could be reopened. Moon then stated that he would "probably play a video on cross that may have something," and the district court instructed the court security officer to wait. The government said, "On cross." Moon responded, "Yeah. I just didn't know if you wanted to bring them in and shuffle them out, Your Honor. Either way."

Nothing more was said on the topic at that point, but the public presumably was allowed back into the courtroom, because a short time later during Ward's testimony, the government once against asked the district court to clear the gallery. The court instructed the gallery to exit the room, and Moon did not object. The government then played numerous videos in which Ward identified areas of Moon's houses and members of Moon's family, including his children. Moon did not play any videos during his cross-examination of Ward, but Moon did not tell the court that he would not be doing so and did not ask that the courtroom be reopened.

After Ward, the government called W.F., who was one of the middle-schoolers taped on the hidden bathroom camera after the Eighth-grade dance. The government told the court that, "this witness and the next, there will be some clips." The government said it had a number of questions before it would

play any clips. The court did not order that the courtroom be reopened to the public, and the trial remained closed for the whole of W.F's testimony and that of the next witness, C.Y. Moon did not object at any point.

After C.Y. testified, the government called Khyle McCord, an employee of Maxell Corporation who testified about when and where the videotapes were manufactured. When McCord began testifying, neither party suggested that the courtroom be reopened. Nor did Moon ask to reopen the courtroom before cross-examining McCord.

After McCord finished testifying, the court asked, "Are there people waiting outside? Are we allowed to let people back in?" The government responded that its next two witnesses were "going to have clips," and the district court said, "Okay. Forget it." Moon did not object.

After that exchange, three more witnesses testified with the courtroom closed, and Moon did not object at the beginning of their testimony or before cross-examining them. Next, the government called Kelly Tittle, a former employee at The Industrial Athlete. After the government asked her a few biographical questions, Moon interrupted to ask, "Are we playing any tapes?" The government said no. Moon asked the court to reopen the courtroom, which it did.

The courtroom remained open for Tittle's testimony and that of three more former Industrial Athlete employees. The

district court closed the trial again at the government's request during the testimony of K.M., one of the twins who appeared on handheld camera footage taped through a window. Moon did not object.

The trial remained closed to the public for the rest of the day. After K.M., the government informed the court before each of the next two witnesses—S.W. and L.C.—that it would be showing clips after some introductory questions. Each time, the court thanked the government and did not reopen the courtroom. Each time, Moon did not object. After L.C., the government called C.P. to testify, and neither party commented on the closure. The last witness of the day was A.R. and, once again, neither party commented on the closure when she was called to the stand. Moon also did not ask the court to reopen the trial before cross-examining K.M., S.W., L.C., or C.P. (He did not cross-examine A.R.)

3. Day 3 of trial

The government presented two final witnesses on the third day of trial: K.F., who identified herself in hidden-camera footage taken when she was 19 or 20 years old, and K.R., who was one of the secretly-filmed twins. The government asked to close the courtroom during K.F.'s testimony because it was "going to play some video clips of a sensitive nature." The court asked the public to go out to the hallway. Moon did not object, nor did he ask the court to reopen the trial for his cross-examination of K.F.

20-13822                Opinion of the Court                21

Neither party mentioned the courtroom closure when K.R. took the stand.  Moon did not ask for the court to be reopened before he cross-examined K.R.

## B.  Motion for a New Trial

The jury found Moon guilty on all six charged crimes.

After the jury's verdict, Moon moved for a new trial under Fed. R. Crim. P. 33.[9]  Among other reasons, Moon's motion argued that he was entitled to a new trial because the district court deprived him of his Sixth Amendment right to an open and public trial through its "repeated and pervasive closing of the courtroom."

After the government responded, Moon replied by arguing that he was not "attempt[ing] to renege on the agreed-upon scope of the limited courtroom closure the parties negotiated prior to the start of trial."  Rather, Moon contended that his new-trial motion "direct[ed] the court to ways in which the closures exceeded the parties' agreement to close the courtroom during the presentation of sensitive evidence."  He stated that, "[i]n no

---

[9] In the same post-verdict filing, Moon also moved for a judgment of acquittal under Fed. R. Crim. P. 29, renewing the acquittal motion he made during trial.  On appeal, Moon does not argue that the evidence was insufficient to support his convictions or that the district court erred in denying his Rule 29 motion.  Therefore we do not discuss his arguments or the district court's order relating to his motion for a judgment of acquittal.

way did Dr. Moon argue in his Rule 33 motion that *all* the closures violated the Sixth Amendment."

The district court ordered Moon to file a notice describing "exactly which portion or portions of the witness's testimony where the courtroom was closed exceeded the scope of Dr. Moon's agreement with the government." The court noted that it was "surprised" by the Sixth Amendment argument because "throughout the trial, Dr. Moon never objected to any courtroom closure, cross-examined witnesses while the courtroom remained closed, and at times even requested closures of the courtroom himself. Moreover, he never raised the issue at any sidebar, or even off the record while the jury was excused."

Moon complied with the court's order. Moon's response explained that he understood the closure agreement to be limited to portions of the trial involving "clips of alleged child pornography, attempts to produce child pornography, or sensitive non-child pornography involving adults and the immediate questioning about those clips."

Moon's filing, in a section titled "Where the closure exceeded the agreement," then explained witness-by-witness his belief that: (1) various closures "complied with the closure agreement"; (2) other closures "exceeded the scope of the closure agreement" or were "not proper under the parties' closure agreement"; and (3) one particular closure "was in no way included within the pre-trial agreement about courtroom closure." The filing also explained Moon's belief that certain

evidence and questions about that evidence were "covered by the closure agreement," while some videos "did not contain pornographic images that would have been contemplated by the closure agreement," and some government questions were "unrelated to the subject of the closure agreement."

The district court denied Moon's motion for a new trial. The district court subsequently sentenced Moon to a total of 360 months' imprisonment. Moon timely appealed.

On appeal, Moon argues that: (1) Agent Wade Green's search of the videotapes was unreasonable under the Fourth Amendment; (2) the repeated courtroom closures violated his Sixth Amendment public-trial right; and (3) the district court abused its discretion in various rulings before and during trial. We begin with Moon's constitutional arguments.

## IV.    SCOPE OF THE SEARCH WARRANT

Moon argues that the district court erred in denying his motion to suppress the tapes and their contents because Agent Wade Green's search of the tapes was beyond the scope of the clinic search warrant.[10]

---

[10] When reviewing a district court's denial of a motion to suppress, we review the court's findings of fact for clear error and its application of law to the facts de novo. *United States v. Campbell*, 26 F.4th 860, 870 (11th Cir. 2022) (en banc). In doing so, we view the evidence in the light most favorable to the prevailing party—here, the government. *Id.* Our review may encompass the entire record. *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007).

The Fourth Amendment requires that search warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This particularity requirement exists "to protect individuals from being subjected to general, exploratory searches." *United States v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2007). The permissible scope of a search is governed by the terms of the warrant, and the search may be "as extensive as reasonably required to locate the items described in the warrant." *United States v. Wuagneux*, 683 F.2d 1343, 1352 (11th Cir. 1982). "The reasonableness of the search depends upon the complexity of the crime being investigated and the difficulty involved in determining whether certain documents" contain evidence of that crime. *United States v. Sawyer*, 799 F.2d 1494, 1509 (11th Cir. 1986); *see Wuagneux*, 683 F.2d at 1349 ("[T]he Supreme Court has recognized that effective investigation of complex white-collar crimes may require the assembly of a 'paper puzzle' from a large number of seemingly innocuous pieces of individual evidence.").

When a warrant authorizes the seizure of documents, "an officer acting pursuant to such a warrant is entitled to examine any document he discovers," in order "to perceive the relevance of the documents to the crime." *United States v. Slocum*, 708 F.2d 587, 604 (11th Cir. 1983) (quotation marks omitted). "[T]he perusal must cease at the point of which the warrant's inapplicability to *each document* is clear." *Id.* (emphasis added) (quotation marks omitted).

We conclude that Agent Green's search of the videotapes was within the scope of the clinic search warrant and, therefore, did not violate Moon's Fourth Amendment rights.  The search warrant application expressly included "videotapes" in its definition of "'records' and 'documents.'"  And the warrant authorized seizure of "tapes."  Given this authorization, Agent Green was entitled to examine each of the tapes he found to perceive their relevance to the crime.  *See Slocum*, 708 F.2d at 604.  And this is exactly what he did, by watching a small amount of each tape.  Watching each one was the "only means" for Agent Green to determine whether each particular tape fell within the warrant.  *See id.* at 604.

Moon argues that videotapes are too obsolete a technology for a reasonable agent to believe they might contain evidence of his clinic's operations, and so even a brief look to see if they were relevant was unreasonable.  Videotapes are so obsolete, he argues, that the government felt the need to have Agent Green explain to the jury what videotapes and VCRs even *are*.  We are not persuaded.  As we mentioned, the warrant expressly provided for the seizure of tapes.  The TV/VCR in Moon's office was plugged in, indicating to Agent Green that the device was operational.  And Agent Green found evidence that Moon had at least one hidden camera device in the office, leading him to believe, reasonably, that the tapes might contain footage related to the clinic's operations, such as footage of incomplete exams or even footage that would show the location of other hidden

cameras.  We conclude that Agent Green's search of the tapes was "reasonably required to locate the items described in the warrant." *See Wuagneux*, 683 F.2d at 1352.

Accordingly, the district court did not err in denying Moon's motion to suppress based on Agent Green's search of the tapes.

## V.    TRIAL CLOSURES

We turn to Moon's Sixth Amendment challenge.  In his motion for a new trial and subsequent filings—as detailed extensively above—Moon argued that the trial closures were broader than the parties' pre-trial agreement to close the courtroom for the display of sensitive evidence.  In his appellate brief, however, Moon argues that "the record contains no support for the suggestion" that such an agreement existed.  And, though he explicitly denied doing so in the district court, he argues here that *every* closure was erroneous.[11]

---

[11] Ultimately, it is not relevant to our analysis exactly to which closures Moon now assigns error.  We do note that Moon's post-trial filing, located on the district court docket at No. 157, expressly contended that the closure was appropriate during all or part of the government's direct examination of fifteen witnesses, but exceeded the scope of the parties' agreement during the entirety of the cross-examination of those same witnesses.  Thus, we must disagree with Moon's argument on appeal that the district court's order denying his Rule 33 motion "inexplicably and erroneously claimed that most of the challenged closures occurred during Moon's own cross-examination." In our view, the district court's finding was neither inexplicable nor erroneous.

After careful and thorough review, we conclude that the record amply supports the existence of an agreement to close the courtroom for certain testimony. The government contends that Moon, by entering this agreement and subsequently failing to object to any closures that purportedly exceeded its scope, waived his right to a public trial.

This Court has not yet held that a defendant may waive his Sixth Amendment right to a public trial. Today, we do. And we hold that, on this record, Moon waived his public-trial right. Therefore, there is no error for us to review. *See United States v. Phillips*, 834 F.3d 1176, 1183 (11th Cir. 2016).

## A. The Right to a Public Trial

The Sixth Amendment guarantees criminal defendants "the right to a speedy and public trial." U.S. Const. amend. VI. This requirement "is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned." *Waller v. Georgia*, 467 U.S. 39, 46, 104 S. Ct. 2210, 2215 (1984) (quotation marks omitted). A public trial "ensur[es] that judge and prosecutor carry out their duties responsibly, . . . encourages witnesses to come forward[,] and discourages perjury." *Id.*

In rare circumstances, a court may find that closure is essential to protect an overriding interest, "such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Id.* at 45, 104 S. Ct. at 2215. A party seeking closure over an objection must

(1) "advance an overriding interest that is likely to be prejudiced" and (2) show that the closure is "no broader than necessary to protect that interest." *Id.* at 48, 104 S. Ct. at 2216. The trial court, in turn, must (1) "consider reasonable alternatives to closing the proceeding" and (2) "make findings adequate to support the closure." *Id.* If there is an objection to closure, the trial court must *sua sponte* consider reasonable alternatives; the opposing party does not carry the burden to suggest them. *See Presley v. Georgia*, 558 U.S. 209, 214, 130 S. Ct. 721, 724 (2010).

## B. Waiver of the Public-Trial Right

The violation of a defendant's Sixth-Amendment public-trial right is a structural error. *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1910 (2017). This means that, "where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to automatic reversal regardless of the error's actual effect on the outcome." *Id.* (quotation marks omitted).

Under certain circumstances, however, structural rights remain subject to the rules of waiver. *See Peretz v. United States*, 501 U.S. 923, 936-37, 111 S. Ct. 2661, 2669 (1991) ("The most basic rights of criminal defendants are . . . subject to waiver."); *see also United States v. Mezzanatto*, 513 U.S. 196, 201, 115 S. Ct. 797, 801 (1995) ("A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution."). A waiver is the "intentional relinquishment or

abandonment of a known right." *Phillips*, 834 F.3d at 1183 (quotation marks omitted).

The U.S. Supreme Court concluded in *Levine v. United States* that a defendant in a criminal contempt proceeding had a right to a public trial derived not from the Sixth Amendment— which does not apply to contempt proceedings—but from the due process clause of the Fifth Amendment. 362 U.S. 610, 616, 80 S. Ct. 1038, 1042 (1960). The Court then held that the defendant waived his due process public-trial right because he was present at his contempt proceedings, was fully aware of the courtroom's closure, and did not object. *Id.* at 619, 80 S. Ct. at 1044; *see Peretz*, 501 U.S. at 936, 111 S. Ct. at 2669 (explaining that *Levine* involved the "waiver of right to public trial").

Several other circuits have since determined that, although *Levine* was a Fifth Amendment case, its waiver principles apply equally in the Sixth Amendment context.[12] *See United States v. Christi*, 682 F.3d 138, 143 n.1 (1st Cir. 2012) (Souter, J., sitting by designation); *United States v. Rivera*, 682 F.3d 1223, 1233 n.6 (9th Cir. 2012); *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006). We agree. In *Levine*, the Supreme Court explained that both the Fifth and Sixth Amendment public-trial rights reflected "the notion, deeply rooted in the common law, that justice must

_____

[12] The Seventh and Eighth Circuits also have held that a criminal defendant may waive his Sixth Amendment public-trial right but without citing *Levine*. *Walton v. Briley*, 361 F.3d 431, 434 (7th Cir. 2004); *Addai v. Schmalenberger*, 776 F.3d 528, 534 (8th Cir. 2015) (citing *Peretz*).

satisfy the appearance of justice." *Levine*, 362 U.S. at 616, 80 S. Ct. at 1042 (quotation marks omitted). Thus, "[a]s the Court explained, the values protected are the same in each case." *Christi*, 682 F.3d at 143 n.1. It follows that the defendant's ability to enter a knowing waiver is the same, too. Accordingly, we hold that a criminal defendant may waive his Sixth Amendment right to a public trial.[13]

While our sister circuits—and now this Court, too—generally agree that a defendant *can* waive his public-trial right, there is some disagreement on exactly *how* such a waiver might occur. The Fifth and Ninth Circuits have held that waiver occurred where the defendants and their counsel were present for the courtroom closures but did not object. *Hitt*, 473 F.3d at 155; *United States v. Cazares*, 788 F.3d 956, 971 (9th Cir. 2015). But the First, Seventh, and Eighth Circuits have held that more than a mere failure to object is needed. *See Christi*, 682 F.3d at 142;

---

[13] While the public-trial right is "one created for the benefit of the defendant[,]" we acknowledge that the public has an important First Amendment right to attend criminal proceedings. *Presley*, 558 U.S. at 213-15, 130 S. Ct. at 723-25 (quotation marks omitted). If a member of the public objects to the closing of the courtroom, the district court remains obligated to balance the interests and consider alternatives to closure, even if both parties agreed. *See id.* at 214-15, 130 S. Ct. at 724-25 (citing *Press-Enter. Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 104 S. Ct. 819 (1984)).

*Walton v. Briley*, 361 F.3d 431, 433-34 (7th Cir. 2004); *Addai v. Schmalenberger*, 776 F.3d 528, 534 (8th Cir. 2015).[14]

We need not decide exactly where that line must be drawn. During trial, Moon's actions (and lack thereof) went far past a mere failure to object to the courtroom closures and into an affirmative, knowing waiver.

Here, the record shows that the parties had a pretrial agreement about certain closures of the courtroom. Further, there were several points early in the trial where Moon affirmatively relinquished or abandoned his public-trial right. *See Phillips*, 834 F.3d at 1183. On the first day of trial, the government all but invited a *Waller* analysis when it explained to the district court that it did not know whether the first video it planned to play during C.R.'s testimony would be "sensitive," but was requesting closure at that time "out of an abundance of caution." If Moon had objected, the government would have had to prove a closure at that point was necessary—or within the scope of the parties' agreement, even—and the district court would have had to consider alternatives and make findings on the

---

[14] We also agree with our sister circuits who have considered the issue that the decision to propose or object to closing the courtroom is a strategic decision and, therefore, the public-trial right may be waived by a defendant's counsel on his behalf. *See, e.g.*, *Hitt*, 473 F.3d at 155; *Martineau v. Perrin*, 601 F.2d 1196, 1200 (1st Cir. 1979); *see also Addai*, 776 F.3d at 532-34 (holding that waiver occurred when "Addai's trial counsel . . . consented to the closure" as part of trial strategy).

record. *See Waller*, 467 U.S. at 48, 104 S. Ct. at 2216. But, with the "subject matter unmistakably on the table," Moon said nothing. *See Christi*, 682 F.3d at 142 ("[T]he circumstances of defense counsel's failure to speak on the matter here [during substantive discussion of the public-trial right] shows that her silence passed beyond inadvertence or passivity to the point of waiver.").

Then, on the second day of trial, it was Moon who expressly interjected and allowed for the possibility that the closures would exceed the scope of the limited-closure pre-trial agreement when he told the court he did not mind "either way" if it did not re-open the courtroom for Elaine Ward's direct examination. Even though the government said the gallery could return for Ward's testimony, Moon's counsel advised that he would "probably play a video on cross that might have something" and he "didn't know if [the court] wanted to bring them in and shuffle them out." This statement clearly signaled that Moon was okay with the courtroom being closed for periods of time not covered by the limited pre-trial closure agreement. And it was only after this statement by Moon's counsel that the trial was closed for more than one witness at a time—without Moon ever suggesting that his earlier "either way" comment was not still his view of the matter. Notably too, the only time Moon asked it to, the district court immediately opened the courtroom to the public.

On this record, we hold that the combination of (1) Moon's pre-trial agreement to close the courtroom for some testimony; (2) his affirmative indications early in the trial that he consented to closures that he knew exceeded that agreement; and (3) his subsequent failure to object to any closures that purportedly exceeded the scope of that agreement together added up to a waiver of his right to a public trial. Thus, no error occurred.[15] *Phillips*, 834 F.3d at 1183.

## VI.    OTHER ISSUES

On appeal, Moon also argues that the district court abused its discretion in: (1) denying his motion for a *Franks* hearing; (2) denying his motion for recusal; and (3) declining to give several of his requested jury instructions regarding the definition of "lascivious exhibition."

After review and oral argument, we conclude that Moon's arguments on these issues have no merit and do not warrant extended discussion.

---

[15] For the first time on appeal, Moon argues that the district court's failure to make individual findings before each closure also violated the public's First Amendment right to view the proceedings. Assuming without deciding that a defendant can make this argument at all, we conclude the district court did not plainly err because no binding precedent clearly states that a court must consider the public's right where the defendant waives his Sixth Amendment right and no members of the public object. Further, nothing herein suggests what should have happened on the merits if a member of the public had objected.

1. Moon's Request for a *Franks* Hearing

Regarding the *Franks* challenge to the affidavit in support of the clinic search warrant, Moon failed to make a substantial preliminary showing that Officer Jason Green made intentionally false or misleading statements in his affidavit in support of his request for the clinic search warrant. *See Franks*, 438 U.S. at 155-56, 98 S. Ct. at 2676. And the district court did not abuse its discretion in determining that probable cause remained even without those parts of the affidavit that the district court excised as arguably false or misleading. *See United States v. Barsoum*, 763 F.3d 1321, 1328-29 (11th Cir. 2014). Thus, Moon did not meet his burden to show that he was entitled to a *Franks* hearing.

2. Moon's Motion for Recusal

As to the recusal motion, Moon relies on evidence that was not part of the record below to question the judge's impartiality. Moon submits that the district court did represent BCBS at some point at her prior law firm. Assuming that Moon's new evidence may be considered on appeal, a reasonable observer still would not "entertain a significant doubt about the judge's impartiality" in this case. *See United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003) (quotation marks omitted). Even if the district court judge previously worked on BCBS matters at her law firm, nothing in the record shows that the district court judge or anyone else at the law firm ever represented BCBS in connection with this case. In any event, the district court judge had been in

office—and therefore no longer a member of her prior law firm— for more than a year before all rulings relevant to this issue.

What's more, the district court was not faced with considering the truth or falsity of the BCBS records themselves, but only with whether Officer Jason Green intentionally omitted material information related to those records. *Cf. Franks*, 438 U.S. at 171, 98 S. Ct. at 2684 (explaining that, in a motion for an evidentiary hearing, "[t]he deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant.") And, because the government moved forward on child pornography charges and not on any healthcare-related charges, BCBS was not involved in the instant case beyond the search warrant affidavit. Its limited role belies Moon's premise that BCBS was a "material witness" in his case and did not give rise to a reasonable question about the judge's impartiality. Even with the prior representation of BCBS, we affirm the denial of the motion to recuse on this basis alone.

3. Moon's Proposed Additional Jury Instructions

Finally, the district court did not abuse its discretion in declining to give the additional jury charges that Moon requested, as their content was "substantially covered by the charge actually given." *See United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

The parties jointly recommended that the court instruct the jury using the Eleventh Circuit Pattern Jury Instructions for

the charged crimes.[16] As relevant here, those instructions informed the jury that Moon could be found guilty of production of child pornography only if he used a minor "to engage in sexually explicit conduct for the purpose of producing a visual depiction." Similarly, they instructed that Moon could be found guilty of possession of child pornography if he knowingly possessed "any visual depiction . . . [whose] production involves using a minor engaging in sexually explicit conduct." And, as relevant here, both instructions defined "sexually explicit conduct" to mean "actual or simulated . . . lascivious exhibition of the genitals or pubic area of any person." They explained:

> "Lascivious exhibition" means indecent exposure of the genitals or pubic area, usually to incite lust. Not every exposure is a lascivious exhibition. To decide whether a visual depiction is a lascivious exhibition, you must consider the context and setting in which the genitalia or pubic area is being displayed. Factors you may consider include:
>
> - the overall content of the material;
> - whether the focal point of the visual depiction is on the minor's genitalia or pubic area;
> - whether the setting of the depiction appears to be sexually inviting or suggestive—for example, in a

---

[16] See 11th Cir. Pattern Jury Instr. O82, O83.4A (2019). The joint proposed instructions were filed before the superseding indictment, but both parties adopted them in later filings.

location or in a pose associated with sexual activity;
- whether the minor appears to be displayed in an unnatural pose or in inappropriate attire;
- whether the minor is partially clothed or nude;
- whether the depiction appears to convey sexual coyness or an apparent willingness to engage in sexual activity; and
- whether the depiction appears to have been designed to elicit a sexual response in the viewer.

The instruction for the possession statute added that "[a] visual depiction need not have all these factors to be a lascivious exhibition."

Moon requested several additional instructions, which he argued were necessary for the jury to understand how to decide whether the images in this case were lascivious.

The district court agreed to add one sentence from Moon's proposals: "Because what constitutes forbidden lascivious exhibition is not concrete, the lascivious nature of visual depictions should be determined with respect to the actual depictions themselves." It denied Moon's six other requested instructions related to the definition of lasciviousness.

After careful review, we conclude that Moon's requested jury instructions were redundant to the instructions that the district court provided on the topic of "lascivious exhibition." Moreover, several of Moon's proposed instructions were based

on case law from other circuits.  The district court did not abuse its discretion by giving the jointly requested instructions from this circuit's pattern, along with one addition requested by Moon.

## VII.  CONCLUSION

Moon has not shown that the district court erred in its pretrial rulings or in conducting his trial.  Accordingly, we affirm his convictions and sentences.

**AFFIRMED.**